IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
At Hartford

CENTRIX, INC.

    Plaintiff/Counter-Defendant

    v.                                 Civil Action No.
                                      3:03-CV-703(CFD)(WIG)

ANDON BRUSH COMPANY, INC.,

    Defendant/Counter-Plaintiff        May 12, 2004

## DECLARATION OF DR. WILLIAM B. DRAGAN

I, DR. WILLIAM B. DRAGAN, hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are true and that these statements are made with the knowledge that willful false statements are punishable under Title 18 USC Section 1001.

1.  I have been a practicing dentist form some forty (40) years, and I founded and organized Centrix, Inc., the plaintiff herein, in 1970.

2.  I have read the Declaration of Robert Newell and the Declaration of Andon's counsel, Mr. Kenneth L. Winters, which were filed in support of Andon's Motion to Enforce the Settlement Agreement, which Andon alleges was reached, at the follow-up settlement conference of April 16, 2004.

I have also read Andon's Memorandum in support of Andon's Motion.

3.  The Declaration of Robert Newell is replete with self-serving statements which are predicated upon Mr. Newell's admitted "layman's" understanding (paragraph 6 of Mr. Newell's Declaration), as to what Mr. Newell considers to be the subject matter defined by the claims of the patents in suit.  A "layman's" understanding of a patented invention, to my knowledge, does not determine whether a particular brush construction is within or without the scope of a patented claim.

4.  I understand Mr. Kenneth L. Winters, the deponent of the Declaration filed in support of Andon's Motion to enforce the alleged settlement agreement, to be the lead counsel and trial counsel for Andon in this matter.

5.  It is apparent to me that Mr. Winters' Declaration is replete with alleged corroborating testimony which merely "parrots" Mr. Newell's "layman's" understanding as to the scope of the patents.  See paragraph 9 of Mr. Winters' Declaration.

6.  Mr. Winters' alleged testimony as stated in paragraphs 9, 10, 11, 12, 13, 14, 15 and 16 of Mr. Winters' Declaration merely repeats verbatim the alleged testimony

set forth in paragraphs 6, 7, 8, 9, 10, 11, 12 and 13 of
Mr. Newell's Declaration.

7.  I have had enough experience with respect to
patent litigation to know that it is improper, if not
unethical, for a party's counsel to give testimony on
behalf of the client.  I am also aware that if such counsel
is to be a witness for the client, that the counsel should
be disqualified from representing that client.

8.  At the conference of April 16, 2004, I did propose
brush constructions that Centrix would consider to be a
non-infringing brush construction.  Those brush
constructions included any brush construction having a
totally solid handle throughout the length thereof or any
brush having a solid handle throughout the length thereof
that is formed with a pre-bent, fixed angle adjacent the
brush end which is not intended to be flexed to any other
adjusted angular position, or a Biederman type brush.
These were the only non-infringing constructions Centrix
agreed to at the April 16, 2004 conference.

9.  In reviewing Mr. Newell's Declaration, it appears
that Mr. Newell's "layman's" description of paragraph 7 was
intended to mean "any brush construction having a totally
solid handle throughout the length of the handle."  If that
was what Mr. Newell so intended, then it would coincide

3

with construction (a) to which I agreed would not comprise an infringing brush construction.

10.  Mr. Newell, in paragraph 9 of his Declaration, in his "layman's" terms appears to be describing a brush having a solid handle throughout the length thereof which has a <u>fixed pre-bent</u> angle adjacent the brush end incapable of being adjusted to another angular position as defined in part and (b) in the Modification (Exhibit 5A) to the Settlement Agreement of January 16, 2004.

11.  Other than the two designs set forth in Centrix's Modification (Exhibit 5A) to the Settlement Agreement of January 16, 2004 (Exhibit 5B), and the Biederman type brush, I did not agree as to any other brush construction as described by Mr. Newell in his Declaration.  Further, I don't really understand the alleged other brush constructions Mr. Newell is attempting to define in his "layman" terms.

12.  Contrary to Mr. Winters' allegation in paragraph 16 of the Winters Declaration, neither the parties nor their attorney advised Magistrate Judge Garfinkel in chambers that an agreement had been reached.

13.  In chambers and after the conference was concluded on April 16, 2004, and in the presence of Mr. Newell, Mr. Winters and myself, Centrix's counsel Arthur T.

4

Fattibene, expressly stated to Magistrate Judge Garfinkel
that nothing discussed at the conference should be
considered in any way prejudicial to Centrix's pending
motion to enforce the settlement agreement of January 16,
2004, attached hereto as Exhibit 5B.  Judge Garfinkel
acknowledged that what was discussed at the conference of
April 16, 2004 would not in any way be deemed to prejudice
Centrix's motion to enforce the settlement agreement of
January 16, 2004 (Exhibit 5B).

14.  No agreement was reached at the conference of
April 16, 2004.  It is my understanding that if the parties
had reached any kind of an agreement at the conference of
April 16, 2004, Judge Garfinkel would have placed the
agreement reached on record.  No such record was made.

15.  The allegations set forth in Paragraphs 18 to 22
of Mr. Winters' Declaration appear to be directed to merely
argument of counsel and to my knowledge, have absolutely no
evidentiary value.

16.  Attached hereto as Exhibit 1 is a copy of a
letter authored by Mr. Winters to Centrix's counsel, Mr.
Fattibene, dated April 19, 2004, in which Mr. Winters
attempted to draft language as to those brush constructions
Andon is allegedly asserting that Centrix agreed to be non-
infringing brushes.

17.  Attached hereto as Exhibit 2 is a copy of Centrix's response dated April 21, 2004, to Andon's proposal of attached Exhibit 1, in which Centrix <u>unambiguously rejected Andon's proposals</u>.  Centrix also advised that since Andon had attempted to expand the scope and/or the number of alleged non-infringing brush designs, Centrix expressly withdrew any proposal made or considered relating to the disposal of Andon's inventory of infringing brushes and <u>that such issue would not be further considered</u>.

18.  Attached hereto as Exhibit 3 is a copy of a letter written by Mr. Winters to Mr. Fattibene dated April 21, 2004, which is a response to Mr. Fattibene's letter dated April 21, 2004 (Exhibit 2).

19.  Attached hereto as Exhibit 4 is a copy of a letter written by Mr. Winters to Mr. Fattibene dated April 22, 2004, to which there is attached an alleged settlement agreement (Exhibit 4A).  In the letter (Exhibit 4), Andon warns that "Andon will proceed to take such action as may be appropriate in light of Centrix's refusal to abide by the settlement reached on April 16, 2004."

20.  Andon's proposed settlement agreement (Exhibit 4A), with the exception of paragraphs 3 and 10, is a virtual verbatim copy of the Settlement Agreement dated

January 16, 2004 attached hereto as Exhibit 5B, which is the subject of Centrix's current pending Motion to Enforce the Settlement Agreement of January 16, 2004. (Exhibit 5B)

21.  It is not understood how Andon can assert that Centrix has agreed to paragraphs 3 and 10 of the draft agreement (Exhibit 4A) attached to Andon's letter dated April 22, 2004 (Exhibit 4), when the subject matters of paragraphs 3 and 10 of Exhibit 4A were expressly rejected by Centrix on April 21, 2004 (Exhibit 2), before the submission of the alleged Settlement Agreement draft, Exhibit 4A.

22.  Exhibit 5 attached hereto is a copy of Mr. Fattibene's letter dated April 26, 2004 to Mr. Winters, that addresses Mr. Winters' letter of April 22, 2004 (Exhibits 4 and 4A) and which further supplements Mr. Fattibene's letter of April 21, 2004 (Exhibit 2).  Attached to Exhibit 5 is a copy of the Modification Agreement (Exhibit 5A) to memorialize the non-infringing brush construction which I had indicated at the conference of April 16, 2004, to constitute a non-infringing brush construction.  Exhibit 5B, attached to Mr. Fattibene's letter dated April 26, 2004 (Exhibit 5) is a copy of the Settlement Agreement of January 16, 2004, which is incorporated by reference into the body of the Modification

7

Agreement (Exhibit 5A), and currently the subject of Centrix's pending Motion To Enforce.

23.  Mr. Fattibene's letters and attachments (Exhibits 2, 5, 5A and 5B) clearly and unambiguously set forth those issues with which Centrix could agree and those issues Centrix could not possibly agree to.

24.  For example, Andon asserts that Centrix agreed that Andon could make "Any brush that is prior art to the patents or which is obvious based on such prior art". Centrix cannot possibly agree to any such language as it is ambiguous, vague and indefinite, and not definitive of any specific brush construction.

25.  Further, I have no recollection of any discussion relating to, nor do I understand, what brush construction Mr. Newell is attempting to describe in his "layman's" terms with respect to those brush constructions referred to in paragraphs 3(b), (c), and (d) in attached Exhibits 4A and also referred to in attached Exhibit 1.

26.  Attached hereto as Exhibit 6 is a copy of a letter written by Mr. Fattibene to Mr. Winters dated April 28, 2004, which was faxed to Mr. Winters and Andon's local counsel to remind them that Centrix was going forward with the Rule 30(b)(6) deposition of Andon scheduled for May 3,

2004, pursuant to a Notice of Deposition that had been duly served on Andon, pursuant to the Court's Scheduling Order.

27.  On May 3, 2004, neither Andon's designated deponent, Mr. Newell, nor any Andon attorney, appeared.

28.  The Notice of Deposition was issued pursuant to a Court Order dated April 14, 2004, permitting the deposition to be rescheduled to a date after the settlement conference.

29.  Andon apparently unilaterally determined that it would not appear for deposition duly noticed.

30.  I have also been advised that Andon's responses to certain interrogatories propounded by Centrix pursuant to the Court's Scheduling Order, which were due April 1, 2004, have not been responded to.  To my knowledge, Andon has not requested any time extension for responding, nor has Andon secured any type of protective order or an extension of time to respond to said interrogatories.

31.  I am also advised that Andon has not produced a single document, which were duly requested months ago.

32.  Attached hereto as Exhibit 7 is a letter written by Centrix's counsel to Magistrate Judge Garfinkel advising that unless Andon was agreeable to modifying the Settlement Agreement (Exhibit 5B), as indicated in attached Modification, Exhibit 5B, that Centrix's time, money and

effort would be better spent in pursuing discovery in view of the Court's somewhat abbreviated scheduling order. Until the Court rules on Centrix's currently pending motion to enforce the Settlement Agreement of January 16, 2004 (Exhibit 5B), Centrix has no other recourse but to proceed in accordance with the Court's Scheduling Order.

33.  Centrix has no desire of aiding Andon to redesign around the claims of the patents in suit and/or restricting the scope of the claims in any way other than as set forth in the Modification Agreement (Exhibit 5A).

34.  Unless a Court decides otherwise, Centrix is of the opinion that the Agreement of January 16, 2004 (Exhibit 5B) is an enforceable agreement.

35.  As there is no Court order staying any discovery, Centrix has no recourse but to comply with the Court's current Scheduling Order.

36.  Over the years, Centrix, Inc. has become world reknown as a manufacturer and supplier of innovative applicators and sundry other dental products for performing various dental procedures.

37.  Centrix owns a portfolio of patents which at last count may exceed one hundred patents, including both domestic and corresponding foreign patents.

38.   Centrix expends a substantial amount of its sales
on research, development and patenting the results of such
research and development.

39.   Two of Centrix's U.S. Patents are involved in the
above entitled litigation, of which I am one of the named
co-inventors of said patents.

40.   The patents in suit are directed to a novel
utility brush construction and a brush design patent, which
have been widely accepted by the dental profession.

41.   The invention covered by the '803 patent in suit
was jointly conceived by John Discko and myself in the
latter part of 1988.  Prototype samples of the inventions
were made by John Discko and myself by hand in November and
December 1988.

42.   I thereafter perceived that the brush which Mr.
Discko and myself invented could be readily manufactured by
any brush making company.

43.   In search of a manufacturer who could supply
Centrix with the newly invented brush, Centrix contacted
the Applicator Company, as well as several competitors of
the Applicator Company.

44.   In the meanwhile, Centrix filed a patent
application to cover various embodiments of the brush
invention.  The application was initially filed on March

11

20, 1989 under Serial No. 325,888, and was eventually
granted as U.S. Patent 5,001,803 on March 26, 1991.

45.  Initially, the Applicator Company indicated that
it did not have all of the necessary equipment to
manufacture the brush for Centrix that embodies the
invention.

46.  Subsequently in or about May 1989, the principals
of Centrix, including myself, met with the principals of
the Applicator Company, viz. Eric Robbins and his cousin
Gerald Robbins.  During this meeting, it was determined
that the Applicator Company's brush machines required some
additional tooling to manufacture the brush embodying the
invention.

47.  Centrix agreed to pay for the necessary tooling
for retrofitting the Applicator Company's machine to
produce the Centrix new brush construction.

48.  Centrix paid the Applicator Company for the
required tooling charge.  In return, Applicator Company
agreed that the tooling for retrofitting the Applicator's
machines to produce the novel Centrix brush would be the
property of Centrix.

49.  In September 1989, Centrix entered into a supply
agreement with the Applicator Company, and the Applicator

Company commenced supplying Centrix with the brushes made to Centrix's specifications.

50.  After the May 1989 meeting, Centrix learned that Robert Newell was the Applicator's employee responsible for maintaining and operating Applicator's brush making machines and acting as Applicator's plant manager.

51.  About December 1989, Gerald Robbins advised Centrix that the Applicator Company was on the verge of bankruptcy, and would soon cease to exist, and that the Applicator Company could no longer supply Centrix with the much needed brushes, as the brushes were being well received by the dental profession.

52.  To prevent any interruption in the supply of brushes, Gerald Robbins, Centrix and Robert Newell began discussions relating to the forming of a new company to supply Centrix with the much needed brushes.  As the talks progressed, it was finally decided that Centrix, Gerald Robbins and Robert Newell would organize the Andon Brush Making Company to provide Centrix with an uninterrupted supply of brushes to satisfy the demand which was ever increasing.

53.  The Andon Brush Company was organized in February 1990 and immediately purchased a brush making machine to supply Centrix with the novel Centrix brushes.  The Andon

stock was equally divided between Centrix, Gerald Robbins
and Robert Newell.

54.  For the next ten (10) years, Andon was Centrix's
sole supplier of the Centrix now patented brush.  During
these years, Centrix was Andon's principal customer.

55.  Over the years, Andon would periodically increase
its prices for making the Centrix patented brushes, to a
point that the cost of making the brushes was causing
Centrix to lose its market share.

56.  About the year 2000, Centrix made the decision to
bring the manufacture of the Centrix patented dental brush
in-house in order to reduce costs and stay competitive.
Accordingly, Centrix invested approximately $400,000.00 for
a state of the art automatic brush making machine capable
of meeting Centrix's brush needs.

57.  Shortly after Centrix commenced making its own
brushes in-house, Gerald Robbins sold his interest in Andon
to Robert Newell.  Centrix is still the owner of one-third
of Andon's issued shares.

58.  Sometime in the year 2000, Robert Newell, as
President of Andon, made the decision to manufacture and
sell brushes identical to the patented Centrix brushes
which Andon had been supplying to Centrix for some ten (10)
years.  Andon, without Centrix's knowledge or authority,

14

commenced the sale of the patented brushes under Andon's own house brand COBRA, to willfully infringe the '803 patent.

59.  As a result, Centrix had no other recourse but to institute this lawsuit for willful patent infringement which was joined with a related claim of unfair competition.

60.  From the inception of this lawsuit, Centrix has diligently sought to amicably resolve this litigation.

61.  A settlement conference was scheduled with the Court for December 3, 2003.

62.  I personally was present at the settlement conference of December 3, 2003.

63.  At the settlement conference of December 3, 2003, the parties made some progress but no final settlement was reached.  The major issue of contention was the monetary payment.  Centrix's original demand was for $15,000.00.  At the settlement conference, Centrix reduced the monetary demand to only $1,000.00, which was not accepted by Andon.

64.  ON or about December 17, 2003, Centrix was advised that Andon had agreed to the $1,000 payment.

65.  After the exchange of a number of drafts, an agreement was reached which was memorialized in the Centrix

January 16, 2004 draft agreement attached hereto as Exhibit 5B.

66. Andon seeks to nullify the agreement of January 16, 2004 (Exhibit 5B), on the grounds that Andon did not agree to a dismissal of Andon's affirmative defense with prejudice. Yet in the preceding drafts submitted to and by Andon, Andon never took issue to the form of the stipulated dismissal, which had at all times required a dismissal of all claims and defenses with prejudice.

67. Accordingly, Centrix filed a motion to enforce the settlement memorialized in the draft agreement of January 16, 2004 (Exhibit 5B), which is still pending before the Court. Attached Exhibit 8 is a copy of Andon's draft of the Settlement Agreement submitted on January 15, 2004, which has been virtually embodied literally in the Settlement Agreement of January 16, 2004 (Exhibit 5B).


_____
                Dr. William B. Dragan


Dated:  May 12, 2004